## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION


BRIDGET STEVENS,             )
                             )
Plaintiff,                   )
                             )
     v.                      )   CAUSE NO.    3:08-CV-51
                             )
HOUSING AUTHORITY            )
OF SOUTH BEND, *et al.*,     )
                             )
Defendants.                  )


## OPINION AND ORDER

This matter is before the Court on the: (1) Motion for Summary
Judgment, filed by Intervenor, the State of Indiana, on September
8, 2009 (DE #57); and (2) Defendants' Motion for Summary Judgment,
filed by Defendants, the Housing Authority of the City of South
Bend, Indiana ("HASB"), Marva Leonard-Dent, Susie Harvey-Tate, Earl
L. Hairston, Rafael Morton, Robert B. Toothaker, and Gladys
Muhammad, also filed on September 8, 2009 (DE #60).[1]  For the
reasons set forth below, the State of Indiana's Motion for Summary
Judgment (DE #57) is **GRANTED** on the grounds that the Court finds
Plaintiff's challenge to Indiana Code section 32-30-3-1 *et seq.* is

---

[1]  The State of Indiana is an intervening party that has been granted the
opportunity to intervene in these proceedings for the purpose of defending the
constitutionality of Indiana Code section 32-30-3-1 *et seq.* ("Ejectment
Statute").  The State of Indiana has submitted its own Motion for Summary
Judgment limited  solely to the issue surrounding the constitutionality of the
challenged Indiana statute.  Because the original defendants and the
intervening State of Indiana have submitted arguments in defense of the
challenged statute, this order will address them together.  All parties will
hereinafter be collectively referred to as "Defendants."

**MOOT**.  Defendants' Motion for Summary Judgment (DE #60) is also **GRANTED**.  The Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Plaintiff's federal claims (Cause of Action Nos. 1-4).  The Clerk is **ORDERED** to **DISMISS WITHOUT PREJUDICE** Plaintiff's state law claims for breach of contract (Cause of Action No. 5) and violation of Indiana's state constitution (Cause of Action No. 6).  Furthermore, the Clerk is **ORDERED** to **CLOSE** this case.

BACKGROUND

Plaintiff, Bridget Stevens, who is African American, resided in HASB property from 2007-2009 with her two sons.  On December 25, 2007, the boyfriend of Ebony Harmon (Plaintiff's daughter), Chester Higgins, was involved in a shooting just outside of Plaintiff's unit, on housing authority property.  Higgins was involved in the shooting with Marcus Henderson (the father of Harmon's two children), who had given a ride home to one of Plaintiff's sons.  After the shooting, HASB issued a thirty-day notice of eviction to Plaintiff in January 2008.

In her complaint filed on January 31, 2008, Plaintiff states claims of segregation in violation of the Fair Housing Act, 42 U.S.C. section 3604(b), interference with the right to contract in violation of 42 U.S.C. section 1981, breach of contract of an alleged third-party beneficiary, due process and equal protection violations of the Fourteenth Amendment in violation of 42 U.S.C.

section 1983, breach of the lease contract under Indiana state law, and due course of law and equal access to courts violation guaranteed by the Indiana state constitution. The complaint requests the following relief: a declaratory judgment finding the Indiana Ejectment Statute violates federal and state law; an injunctive order, and compensatory and exemplary damages.

On September 11, 2008, the State of Indiana was granted leave to intervene in the case pursuant to 28 U.S.C. section 2403(b) for the purpose of defending Indiana's Ejectment Statute. Intervenor and Defendants both filed their instant motions for summary judgment on September 8, 2009, requesting that the Court enter summary judgment against Plaintiff on all claims raised in the complaint because there are no genuine issues of material fact, and Defendants are entitled to summary judgment as a matter of law. Plaintiff filed her responses to the motions for summary judgment on November 16, 2009. The State of Indiana filed its reply on December 4, 2009, and the original Defendants filed their reply on December 8, 2009. Having been fully briefed, the motions are now ripe for adjudication.


DISCUSSION

Undisputed Facts

The HASB provides affordable housing services for low and moderate income families, including the renting of apartments and

single-family homes. (Affidavit of Tonya Robinson, Manager of Public Housing at HASB ("Robinson Aff."), ¶ 5.) Plaintiff, Bridget Stevens, applied to HASB for housing on October 23, 2006. (Robinson Aff., ¶ 9; Public Housing Application, p. 2; Deposition of Bridget Stevens ("Pl. Dep."), pp. 331–32.) On the application, Plaintiff indicated that she had never previously lived in a unit subsidized by a federal program or in a building owned by the HASB. (Robinson Aff., ¶ 12; Public Housing Application, p. 2; Personal Decl., p. 2.) In reality, Plaintiff had received federal housing in the past and had left that apartment with an outstanding balance owed to HASB. (Pl. Dep., pp. 61-62, 93; Robinson Aff., ¶¶ 13-15.) Plaintiff also indicated that her two sons, Alfernando and Armando, would be living as residents in her home. (Personal Decl., p. 1.) As part of the application process, Plaintiff signed an acknowledgment form taking responsibility for the actions of her children, visitors, and guests. (Acknowledgment; Pl. Dep., p. 332.) Plaintiff was aware that the falsification of information could lead to fines; additionally, it could result in the denial of an application, or the termination of an existing lease. (Pl. Dep., p. 91; Robinson Aff., ¶ 14.)

On September 17, 2007, Plaintiff and her two sons were offered a three-bedroom unit at 1265 South Bend Avenue. (Robinson Aff., ¶ 16; September 17, 2007 Letter; Pl. Dep., pp. 112–14.) Plaintiff accepted the offer and executed the Dwelling Lease on September 20,

2007. (Robinson Aff., ¶ 18; Pl. Dep., p. 121.) The Dwelling Lease stipulates that only Plaintiff and her two sons are permitted to reside in the apartment and that each of those three persons are considered members of the household and residents of the dwelling unit. (Dwelling Lease, pp. 1-2.) The Lease also dictates that:

> THE RESIDENT AGREES THAT HE OR SHE SHALL BE RESPONSIBLE FOR THE ACTIONS OF ALL HOUSEHOLD MEMBERS AND ALL GUESTS OF HOUSEHOLD MEMBERS, AND THAT ANY VIOLATIONS OF THIS LEASE BY SUCH PERSONS SHALL BE GROUNDS FOR TERMINATION OF THIS LEASE AND EVICTION OF ALL HOUSEHOLD MEMBERS FROM THE DWELLING UNIT.

(Dwelling Lease, p. 2.) The lease further provides that guests may not occupy the premises for periods beyond one week without acquiring the written approval of HASB and that "visitors may not occupy the premises for more than fourteen days within a twelve-month period." (Dwelling Lease, p. 9.) Residents, members of the household, guests, or other persons under their control shall not engage in:

(a) Any Activity that threatens the health, safety, or right to peaceful enjoyment of HASB's public housing premises by other residents or employees of HASB; or

(b) Any drug-related criminal activity on or off such premises. Any criminal activity in violation of the preceding sentence shall be cause for termination of this Lease and eviction from the Dwelling Unit.

(Dwelling Lease, p.10.)

Additionally, the Lease expressly includes HASB's "Zero Tolerance" policy, whereby any criminal conduct that is drug-related or that "threatens the health, safety, or right to peaceful enjoyment of HASB public housing by other Residents" provides cause for termination of the Lease and eviction, even in the absence of an arrest or conviction. (Dwelling Lease, p. 15.) The Lease clearly provides that "ANY CRIMINAL ACTIVITY OR DRUG-RELATED CRIMINAL ACTIVITY SPECIFIED ABOVE CONSTITUTES A SERIOUS VIOLATION OF MATERIAL TERMS OF THE LEASE AND WILL BE GROUNDS FOR TERMINATION OF THE LEASE AND EVICTION FROM THE DWELLING UNIT." (Dwelling Lease, p. 15.) If a violation occurs, the Lease provides HASB with discretion to consider, if it so chooses, other circumstances including the seriousness of the offense and the extent of participation by family members. (Dwelling Lease, p. 16.)

On December 25, 2007, Plaintiff's daughter's boyfriend, Chester Higgins, drove Plaintiff's daughter, Ebony Harmon, and Harmon's children to Plaintiff's apartment. (Pl. Dep., pp. 130-31.) Plaintiff knew that Higgins was dating Harmon. (Pl. Dep., p. 85; Deposition of Ebony Harmon, "Harmon Dep.," p. 150.) Harmon claims she told Plaintiff that Higgins would be accompanying her and her children to the apartment. (Harmon Dep., p. 147.) Plaintiff claims that she did not know Higgins was accompanying Harmon and her children to the apartment, and she had never seen Higgins before that day. (Pl. Dep., pp. 129-131; Harmon Dep., p. 44.)

However, Plaintiff knew Harmon did not have a car and knew that Harmon and the children were receiving a ride to her apartment. (Harmon Dep., p. 146.) Additionally, Plaintiff did invite Harmon and her grandchildren to her apartment. (Pl. Dep., pp. 128-29.)

After arriving at Plaintiff's apartment, Higgins accompanied Harmon to the front door of the apartment to drop off Plaintiff's grandchildren so that Plaintiff could take them to her mother's to open Christmas presents. (Pl. Dep., p. 131; Harmon Dep., p. 147.) Higgins never entered Plaintiff's apartment. (Pl. Dep., p. 157.) At the time of the shooting incident, the group was not inside Plaintiff's apartment opening presents - contrary to what HASB was initially told by the police. (Robinson Aff., ¶ 20; Pl. Dep., p. 157.)

Meanwhile, Alfernando, one of Plaintiff's sons and a registered member of Plaintiff's household, arrived at Plaintiff's apartment after being driven there by Marcus Henderson, the biological father of Harmon's two children. (Robinson Aff., ¶ 20; Harmon Dep., p. 52; Pl. Dep., p. 134.) Alfernando had flagged Henderson down from the side of the road and asked him for a ride home. (Deposition of Alfernando Stevens, "Alfernando Dep.," p. 66.) Although there are different accounts about who started the shooting, it is undisputed that Higgins and Henderson both shot at each other in front of Plaintiff's unit. (Pl. Dep., pp. 134-35; Alfernando Dep., pp. 50-51; Harmon Dep., p. 150.) Higgins was shot and taken to the

hospital by Harmon. (Harmon Dep. 54, 150; Pl. Dep. 147). Higgins and Henderson had been involved in a physical altercation three weeks earlier at Harmon's house when Henderson slashed at Higgins with a knife. (Harmon Dep., pp. 60-63.) Neither Plaintiff nor Harmon believe Henderson's or Higgins' actions were threats, domestic violence, or stalking directed at Plaintiff or Harmon. (Harmon Dep., pp. 152-53; Pl. Dep., p. 161.)

As a result of the December 25, 2007 shooting, HASB issued a thirty-day notice of termination on January 14, 2008, instructing Plaintiff to vacate the apartment for her connection to the criminal activity that endangered the lives of the development's other residents. (Robinson Aff., ¶ 21; January 14, 2008 Notice to Terminate Lease.) After the notice, Plaintiff filed this lawsuit and continued to live in the apartment unit. (Robinson Aff., ¶ 24.)

Several months after the lawsuit was filed, HASB learned of drug-related, criminal, and other activities going on at Plaintiff's apartment. (Robinson Aff., ¶ 24.) For example, on October 2, 2008, the South Bend Police were called to Plaintiff's apartment to investigate a fight between Plaintiff and her husband, Christopher Broadnax. (November 6, 2008 Notice to Terminate Lease; November 24, 2008 Notice to Terminate Lease; Robinson Aff., ¶ 25; Pl. Dep., p. 163.) Broadnax reported to the police that Plaintiff was high on crack cocaine. (November 6, 2008 Notice to Terminate Lease; November 24, 2008 Notice to Terminate Lease; Robinson Aff.,

¶ 25; Pl. Dep., p. 165.) Plaintiff denies these drug charges, and was not arrested for them. (Pl. Dep., p. 165.)[2]

Broadnax reported Plaintiff's apartment as his principle place of residence and he used Plaintiff's residence to plug in his house arrest monitor for approximately two to three weeks. (November 6, 2008 Notice to Terminate Lease; Harmon Dep., pp. 33-34; Pl. Dep., pp. 166, 169.) Broadnax was not named as a household member on Plaintiff's Lease and he had not been authorized as a visitor by HASB. (Robinson Aff., ¶ 28; Pl. Dep. 167.) Plaintiff denies that Broadnax was living at her apartment; however, she did permit him to register his house arrest monitor to her apartment and stay there for that period of time. (Pl. Dep., pp. 166, 169.)

On November 5, 2008, the South Bend Police Department was again called to Plaintiff's address to investigate an altercation between Plaintiff and Broadnax. (November 6, 2008 Notice to Terminate Lease; November 24, 2008 Notice to Terminate Lease; Robinson Aff., ¶ 26; Pl. Dep., p. 170-71.) Broadnax alleged that Plaintiff had stabbed him, and showed police a laceration on his stomach. (November 6, 2008 Notice to Terminate Lease; November 24, 2008 Notice to Terminate Lease; Robinson Aff., ¶ 26; Pl. Dep., pp. 170-71.) Plaintiff claims that she was peeling potatoes and that the stabbing was an accident. (Pl. Dep., pp. 170-71.) While in her apartment, the police found two marijuana blunt roaches on the

---

[2] Plaintiff was arrested on that date, but not for drug charges. She was arrested on an outstanding warrant for a theft at a Kohl's retail store. (Pl. Dep., p. 164.)

kitchen counter.  (November 24, 2008 Notice to Terminate Lease.)

Due to these activities relating to Broadnax and drugs, HASB issued a second termination notice (on November 6, 2008), and a third termination notice (on November 24, 2008), to Plaintiff. (Robinson Aff., ¶¶ 24, 27, 29.)  These two later termination notices had nothing to do with the shooting on December 25, 2007, and they were not addressed by Plaintiff or added to the complaint by way of amendment.[3] (Robinson Aff., ¶ 24; Pl. Dep., p. 193.) Plaintiff never received a complaint for immediate possession of the apartment for the subsequent incidents involving Broadnax. (Pl. Dep., p. 225.)  HASB had filed a claim for immediate possession in small claims court after the shooting incident; however, after Plaintiff initiated this lawsuit, HASB dismissed that claim.  (Pl. Dep., p. 225; Pl. Reply to Counterclaim, ¶¶ 7-9.)

At the time Plaintiff initiated this lawsuit, she and her sons had not been evicted, and they continued to reside at 1265 South Bend Avenue until Plaintiff vacated her unit on January 27, 2009. (Robinson Aff., ¶ 30; Pl. Dep., pp. 188-89, 204.)  After she got the second and third eviction notices, Plaintiff voluntarily vacated her apartment on January 27, 2009.[4]  (Pl. Dep. 183, 311-12).  Plaintiff decided she was not going to fight the situation

_____

[3]The later two termination notices (November 6, 2008, and November 24, 2008), were received by Plaintiff after she filed her complaint in this case on January 31, 2008.

[4] The term "voluntary" is not being used to suggest that Plaintiff wanted to leave, rather, that she was not forced to leave by any court order or physical use of force.  Plaintiff continues to contend that her move was not voluntary in the sense that she only left because the notice informed her that she had to move within 30 days. (Pl. Dep., p. 183.)

and "just decided to move." (Pl. Dep., p. 312.) She did not contact or talk to anyone at HASB prior to moving. (Pl. Dep., p. 188.) Plaintiff left a letter to HASB stating that she was "done with [the] unit." (Moving Letter; Pl. Dep., p. 312.)

The only complaint against HASB's treatment of Plaintiff stems from its decision that Plaintiff was in control of the people involved in the December 25, 2007, shooting and that her lease should be terminated based on that control; in Plaintiff's mind, the HASB has not violated the Lease in any other way.[5] (Pl. Dep., pp. 128, 196-98.) Plaintiff has no knowledge of the demographics of the housing development area, or of South Bend in general - before, during, or after the time she left. (Pl. Dep., pp. 200-03.)

Plaintiff alleges that Defendant, Marva Leonard-Dent, is the Executive Director of HASB, and that Defendants, Susie Harvey-Tate, Earl L. Hairston, Rafael Morton, Robert Toothaker, and Gladys Muhammad, are Commissioners of HASB. (Compl., ¶¶ 5, 6.) There is no evidence that Defendants Harvey-Tate, Hairston, Morton, Toothaker, or Muhammad had any involvement in the decision to issue the January 2008 termination of lease notice. (Pl. Dep., pp. 210-11.) Nor does Plaintiff know of any reason to believe that any of HASB's actions were motivated by race. (Pl. Dep., p. 196.)

As a result of these events, Plaintiff has moved in with her

---

[5] Plaintiff agrees that "the present litigation involves only the events of December 25, 2007, and HASB's actions pertaining to those events. As HASB recognizes, the subsequent eviction notices of 2008 . . . are not part of this case." (Opp. Mem., p. 6.)

mother. (Pl. Dep., p. 41.) She enjoys the neighborhood better. (Pl. Dep., pp. 43, 45.) All of Plaintiff's claimed compensatory damages relate to the emotional distress of receiving the eviction notice around Christmas time. (Pl. Dep., pp. 211-13.) Plaintiff experienced no out-of-pocket monetary expenses as a result of the move. (Pl. Dep., p. 329.) Nor does Plaintiff pay any rent or utilities at her current residence. (Pl. Dep., pp. 41-42.) Plaintiff has not sought the care of a doctor, psychiatrist, or other health care provider or clergy for any physical or emotional symptoms of her claimed emotional distress damages. (Pl. Dep., p. 213.) Plaintiff has no desire to move back into her apartment or into any other South Bend Avenue apartment. (Pl. Dep., 225.) However, Plaintiff has indicated that she would be interested in returning to another housing authority property at some point in the future if it was appropriate for her and her sons. (Pl. Dep., pp. 297, 313.)

Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal

that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.


**Plaintiff's Claims Against Defendants Leonard-Dent, Harvey-Tate, Hairston, Morton, Toothaker, and Muhammad are Redundant and Must be Dismissed**

In addition to charges against the HASB, Plaintiff has included individual charges against Defendants, Marva Leonard-Dent, Susie Harvey-Tate, Earl L. Hairston, Rafael Morton, Robert Toothaker, and Gladys Muhammad, all employees of the HASB. Plaintiff refers to Marva Leonard-Dent as Executive Director of HASB, noting that she "has responsibility for operation of [HASB] in compliance with federal and state law." (Compl., ¶ 5.) Similarly, the other named defendants are referred to as "Commissioners of HASB" who "have

14

responsibility for oversight of Defendant [HASB] and its management, all in compliance with federal and state law." (Compl., ¶ 6.)

Plaintiff does not specify whether the individual defendants have been sued in their individual or official capacities (or both). However, "[i]n the absence of any express statement that the parties are being sued in their individual capacities, an allegation that the defendants were acting under color of law generally is construed as a suit against the defendants in their official capacities only." *Yeksigian v. Nappi*, 900 F.2d 101, 104 (7th Cir. 1990) (citing *Meadows v. Indiana*, 854 F.2d 1068, 1069 (7th Cir. 1988), *Kolar v. County of Sangamon*, 756 F.2d 564, 568 (7th Cir. 1985)). Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n. 55 (1978)). If a plaintiff brings suit against a government entity, any claim against an officer of that entity in his or her official capacity is redundant and should be dismissed. *Comer v. Housing Auth. of City of Gary, Ind.*, 615 F.Supp.2d 785, 789-90 (N.D. Ind. 2009); *see also Graham*, 473 U.S. at 165-66; *Schmidling v. City of Chicago*, 1 F.3d 494, 495 n.1 (7th Cir. 1993).

Plaintiff failed to specify whether the individual defendants were being sued in their individual or official capacities, and she

chose not to address this issue in her opposition memorandum; therefore, the claims against the individual defendants are construed as a suit against them in their official capacities as officers of HASB. *See Yeksigian*, 900 F.2d at 104. Because the HASB is also listed as a party and the claims against the individual defendants are identical to the claims against HASB, the claims against the individual defendants are dismissed. *See Schmidling*, 1 F.3d at 495 n. 5 (dismissing the mayor from suit in his official capacity because the same claims were being made against the city).

## Plaintiff's Challenge to the Indiana Ejectment Statute is Moot

Article III section 2 of the United States Constitution limits federal court jurisdiction to "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). A case becomes moot when the court "can no longer affect the rights of litigants in the case." *Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) (internal quotations omitted); *see also Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006) (quotation omitted) ("[a] case becomes moot when a court's decision can no longer affect the rights of litigants in the case before them and simply would be an opinion advising what the law would be upon a hypothetical state of facts"). "'When the issues presented are no longer 'live' or the parties lack a legally cognizable interest in

the outcome,' the case is (or the claims are) moot and must be dismissed for lack of jurisdiction." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 626 (7th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quotation omitted). Claims for injunctive relief are moot "once the threat of the act sought to be enjoined dissipates." *Brown*, 442 F.3d at 596.

If, however, a plaintiff seeks monetary damages, the claim may survive even if the underlying misconduct has ceased*. Id.* at 596; *see also Powell*, 395 U.S. at 496; *Crue v. Aiken*, 370 F.3d 668, 677–78 (7th Cir. 2004). In her complaint, Plaintiff does request "compensatory and exemplary damages." (Compl., p. 7.) Yet in her opposition memoranda, Plaintiff conspicuously does not contend that her claim is not moot because she seeks monetary damages. Nor could she, really. As admitted in her deposition testimony, Plaintiff moved in with her mother, experienced no monetary losses as a result of the move, and does not pay rent or utilities. (Pl. Dep., pp. 41-42, 43, 45.) To the extent Plaintiff contends she deserves compensatory damages due to the emotional distress of receiving the eviction notice during the holidays (and she admits this is the only damages she claims), this argument fails because

Plaintiff concedes she did not suffer any physical symptoms, and sought no form of medical or psychiatric treatment. (Pl. Dep., pp. 213-14.) To recover under a claim of intentional infliction of emotional distress, a plaintiff must prove that the defendant (1) intentionally or recklessly (2) engaged in extreme and outrageous conduct (3) causing (4) severe emotional distress to the plaintiff. *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009). A defendant's conduct must be so extreme and outrageous as to be "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999). Here, Defendants' action of issuing an eviction notice on January 14, 2008, simply does not rise to the level of extreme and outrageous conduct. Moreover, Plaintiff cannot prove that the eviction notice (instead of the shooting incident) caused her alleged emotional distress, nor has she shown any physical manifestations of her alleged emotional distress. Thus, Plaintiff is left only with claims for a declaratory judgment and an injunction. (Compl., p. 7.)

Plaintiff does contend that the "capable of repetition yet evading review" doctrine saves her claim that the Indiana Ejectment Statute is unconstitutional. If "there is a reasonable likelihood that a plaintiff will again suffer the deprivation of [] rights," a case may remain justiciable. *See Honig v. Doe*, 484 U.S. at 318. This "capable of repetition while evading review" exception

requires that the specific plaintiff show a reasonable expectation of being subjected to the offending behavior in the future to avail himself of the exception. *Alvarez v. Smith*, 130 S.Ct. 576, 581 (2009); *Los Angeles v. Lyons,* 461 U.S. 85, 109 (1983) ("[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality"). The exception permits federal courts to adjudicate cases that would otherwise be moot if two conditions are present: "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party will be subjected to the same action again." *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 730 (7th Cir. 2006) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990)). Courts have declined to determine that a controversy falls under the exception when it is the plaintiff's own procedural missteps that prevent judicial review. *Protestant Mem'l Med. Ctr.*, 471 F.3d at 731. "The mere physical or theoretical possibility of the injury being repeated is insufficient to satisfy this prong." *Id.* (quoting *Holstein v. City of Chicago*, 29 F.3d 1145, 1148 (7th Cir. 1994)). To utilize the doctrine, a plaintiff must demonstrate that he will necessarily be subjected to "precisely the same treatment" that he

received in the earlier controversy. *Worldwide Street Preachers'*
*Fellowship v. Peterson*, 388 F.3d 555, 559 (7th Cir. 2004).

Plaintiff's reliance on *Honig v. Goe*, 484 U.S. 305, 318 (1988),
and the "capable of repetition" exception is unwarranted. Although
Plaintiff did testify that she desires to return to HASB property,
this argument fails for two reasons. First, in addition to
Plaintiff's testimony that she "just decided to move," the record
demonstrates that Plaintiff voluntarily left the apartment to
comply with the last two notices to vacate that were unrelated to
the shooting incident notice (issued nearly a year earlier).
Plaintiff cannot rely on the exception because it was the
Plaintiff's own decision to vacate her apartment. *See Protestant*
*Mem'l Med. Ctr.,* 471 F.3d at 731 (finding the capable of repetition
exception inapplicable when it is the plaintiff's own procedural
misstep that prevents review).

Second, Plaintiff has failed to show "a reasonable expectation
that the same complaining party will be subjected to the same
action again." *Lewis*, 494 U.S. at 481. Although Plaintiff did, at
one point, testify that she would be interested in moving into
other housing authority property, she has not set forth any
evidence demonstrating any reasonable expectation that she will
move back into housing authority property or that she will be
subjected to the same action again. The Seventh Circuit has
declined to apply the exception when a plaintiff "fail[s] to

demonstrate that it will necessarily be subjected . . . to precisely the same the same treatment" that was involved in the earlier controversy. *Worldwide Street Preachers' Fellowship*, 388 F.3d at 559. Even if Plaintiff does apply for and move back into housing authority property, she has presented no evidence that she, members of her household, or guests will engage in activities in direct violation of a housing authority lease or that individuals invited onto housing authority property by her family will engage in dangerous and criminal conduct that would be attributed to her.

Plaintiff's constitutional claim against the Indiana statute is moot because she has long vacated the apartment. Although Plaintiff claims she had no choice but to leave her apartment, the facts and Plaintiff's own deposition tell a different story. Despite receiving a notice to vacate in January 2008, Plaintiff continued to occupy the apartment until a year later, January 2009. HASB did initially file a claim for immediate possession stemming from the shooting incident; however, HASB dismissed that action. Plaintiff also received two eviction notices in November 2008, but none of the events leading up to those notices (the fights with Broadnax, the allegation that Plaintiff was high on crack cocaine, the injury Broadnax suffered allegedly at the hand of Plaintiff, and the marijuana roaches found in the unit), are being challenged by Plaintiff, and they did not lead to any action for immediate possession.

Additionally, Plaintiff's own statements indicate that the move was voluntary. Plaintiff testified that she did not fight the situation and "just decided to move." (Pl. Dep., p. 312.) She did not contact or talk to anyone at HASB prior to moving. Plaintiff's move could not have been in response to the January 2008 eviction notice regarding the shooting, because Plaintiff stayed more than a year past that deadline. Rather, Plaintiff's move was in response to the deadline of a second and third notice of lease violations (the November 2008 notices) that were unrelated to the notice of violation at issue in her complaint. Finally, Plaintiff left a letter to the HASB stating that she was "done with [the] unit." (Moving Letter; Pl. Dep., p. 312.) The requisite personal interest that existed at the time the complaint was filed ended when Plaintiff voluntarily moved. *See North Carolina v. Rice,* 404 U.S. 244, 246 (1971) (noting a case becomes moot when a court's decision can no longer affect the rights of the litigants before it and would be nothing but an advisory opinion on hypothetical facts). Furthermore, it is undisputed that Plaintiff did not suffer any monetary damages and seeks only injunctive and declaratory relief with respect to her constitutional claims. Claims for injunctive relief are moot "once the threat of the act sought to be enjoined dissipates." *Bartholomew Consol. Sch. Corp.*, 442 F.3d at 596. Similarly, claims for declaratory judgment should be dismissed for mootness unless a claim for damages remains. *Id.*

As such, Plaintiff's constitutional claim is moot and summary judgment is appropriate.

Finally, Plaintiff's claim is moot because Plaintiff was evicted on alternative grounds not at issue in this case. Plaintiff lied about her history of public housing history, permitted an unauthorized visitor to stay at her apartment, was involved in a possibly violent domestic dispute, and was caught with marijuana in her apartment. All of these violations, totally unrelated to the Christmas shooting incident, are grounds to evict Plaintiff. (Robinson Aff., ¶ 14; Dwelling Lease, pp. 1-2, 10, 15.) Because of these alternative grounds, a favorable judgment on this issue would no longer affect the rights of Plaintiff. *See Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) (finding claim moot where contract had expired and court could "no longer affect the rights of the litigants in the case"); *see also Brown*, 442 F.3d at 596; *Lowery v. Housing Auth. Of Terra Haute*, 826 N.E.2d 685, 690 (Ind. Ct. App. 2005) (affirming judgment in favor of housing authority, stating even if plaintiff tenant did not have control over the alleged criminal activity that occurred in her unit, there was an alternative basis for the eviction, because plaintiff admitted to violating the lease provision prohibiting boarders).

Lastly, the Court addresses Plaintiff's argument that under Indiana case law, Plaintiff's claim is not moot. Plaintiff gives this Court no authority in support of the position that Indiana

state law should apply to Plaintiff's attack of a statute in federal court. However, even assuming, *arguendo*, that Indiana mootness limitations were controlling, Plaintiff's claims are still moot. The Supreme Court of Indiana has stated that:

> [w]hile Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies, the Indiana Constitution does not contain any similar restraint. Thus, although moot cases are usually dismissed, Indiana courts have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of great public interest.

*Matter of Lawrance,* 579 N.E.2d 32, 37 (Ind. 1991). In *Lawrance*, the issue was whether parents could authorize the withdrawal of artificially provided nutrition and hydration from their daughter (who died during the appeal). Unlike *Lawrance* and other cases involving matters of great public interest, *see, e.g., Indiana Educ. Employment Relations Bd. v. Mill Creek Teachers Ass'n*, 456 N.E.2d 709, 712 (Ind. 1983) (involving a claim of unfair labor practice against school board which would recur year after year), the issue in this case is not likely to be repeated between many different parties, and Plaintiff simply has not shown that this case involves questions of great public interest.

In sum, Plaintiff has failed to provide any evidence from which a reasonable trier of fact could conclude that she did not voluntarily move out of her housing authority property for reasons unrelated to the shooting incident at issue in this case.

24

Furthermore, Plaintiff has failed to demonstrate to a reasonable expectation that she will return to housing authority property and experience precisely the same treatment that was involved in the earlier controversy. Therefore, Plaintiff's claim challenging the constitutionality of the Indiana Ejectment Statute is moot as Plaintiff lacks standing to challenge the statute, and it must be dismissed.[6]

## Plaintiff's Segregation Claim Has no Legal Basis and Must be Dismissed

Plaintiff alleges that Defendants segregated against her and her sons on account of their race by locating the South Bend Avenue apartments in a portion of South Bend that is primarily African American, or non-Caucasian, in violation of the Fair Housing Act. Defendants argue this claim has no legal basis because it is a post-acquisition claim of discrimination, rather than a claim concerning "access" to housing.

Section 3604(b) of the Fair Housing Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . .." The Seventh Circuit has held that claims under Section 3604(b) must concern "access" to housing, not post-

---

[6]Because Plaintiff's attack on the Ejectment Statute is moot, this Court does not reach the constitutionality of the statute.

acquisition claims of discrimination. *See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004); *see also Jones v. South Bend Hous. Auth.*, No. 3:08-cv-596, 2009 WL 1657466, at *2-*3 (N.D. Ind. June 10, 2009). However, in this case, it is not disputed that Plaintiff was granted access to public housing.

Plaintiff argues that her segregation claim is timely and proper because she moved into the complex in 2007, and she has alleged a continuing violation by HASB in its segregation. The Fair Housing Act carries a two-year statute of limitations period after which plaintiffs are barred from bringing claims. 42 U.S.C. § 3613(a)(1)(A). Yet, if a plaintiff can link otherwise time barred acts to acts occurring within the relevant limitation period, the time barred acts can survive under the "continuing violation" exception. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982); *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). A plaintiff may bring suit for those past discriminatory acts if "they stem from a persistent process of illegal discrimination." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 265 (7th Cir. 1996) (citations omitted). The fact that a series of discriminatory actions occurred as a continuous course of conduct will only delay the tolling of the statute of limitations if the discriminatory character of those acts was not apparent when they were committed. *See Moskowitz v. Trustees of Purdue University*, 5

F.3d 279, 281-82 (7th Cir. 1993).  To survive a motion for summary judgment, a plaintiff must produce "sufficient evidence to establish that there existed a genuine issue of fact whether the defendants' acts were related closely enough to constitute a continuing violation or were merely discrete, isolated, and completed acts which must be regarded as individual violations." *Selan*, 969 F.2d at 565 (quotation omitted).

First, Plaintiff's segregation claim is untimely.  Although the Seventh Circuit has never directly addressed the scenario presented in this case, several other circuits have.[7]  In an analogous case, the Fourth Circuit recognized that the continuing violation exception does not apply when the alleged harm is actually continual ill-effects stemming from an original violation.  *See Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 189 (4th Cir. 1999) (dismissing plaintiff's claim of a continuing violation as merely ongoing effects of an original decision to locate a highway in a particular area).  The Ninth Circuit made a similar distinction when it held that the ill-effects of an original failure to properly design or construct does not rise to the level of a continuing violation. *See Garcia v. Brockway*, 526

---

[7] Plaintiff's reliance on *Moskowitz v. Purdue University*, 5 F.3d 279, 282 (7th Cir. 1993), is inapposite.  There, the Seventh Circuit addressed whether the continuing violation theory applied to an Age Discrimination in Employment claim, where a series of alleged discriminatory acts deprived a former biology professor of suitable laboratory space.  *Moskowitz* does not allege discriminatory acts committed by the housing authority.  Maybe more importantly, *Moskowitz* does not help Plaintiff because that Court held that the continuing violation theory was inapplicable in that case.

F.3d 456, 463 (9th Cir. 2008) (finding that the decade long ill-effects of a failure to design and construct apartments according to FHA regulations did not constitute a continuing violation). Although not binding, this Court finds the Fourth and Ninth Circuit's reasoning persuasive. In this case, HASB's decision to locate the South Bend Avenue apartments in a particular portion of South Bend was an original and discrete act. At best, Plaintiff is feeling the ill-effects stemming from original design and construction decisions. Because the continuing violation exception does not apply, Plaintiff's claim about the nearly fifty-year-old decision concerning the location of the South Bend Avenue apartments is untimely and must be dismissed.

Even if Plaintiff were able to sufficiently demonstrate a continuing violation, thereby enabling her to bring a segregation claim based on the apartment's location, Plaintiff has failed to meet the evidentiary burden necessary to survive a motion for summary judgment. A nonmovant may not rest upon mere allegations but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Becker*, 914 F.2d at 110; *Schroeder*, 875 F.2d at 620. When questioned about her segregation claim, Plaintiff testified that she had no knowledge of the demographics of South Bend when the apartments were built, no knowledge of the demographics of South Bend when she moved into the apartment, no knowledge of the decision-making process leading to

the construction of the South Bend Avenue apartments, and no evidence that the location of the property actually segregated non-Caucasians on the basis of race. (Pl. Dep., pp. 200-03.) Plaintiff's bare assertion that the apartment was segregated is insufficient to survive summary judgment and must be dismissed.


## Plaintiff's Section 1981 and Equal Protections Claims Must be Dismissed

Plaintiff also contends that, in terminating her lease, HASB unlawfully interfered with Plaintiff's ability to exercise her section 1981 rights. 42 U.S.C. section 1981 provides in pertinent part that everyone "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). In order to prevail on a section 1981 claim, a plaintiff must prove that she has been the victim of intentional or purposeful discrimination; in other words, disparate impact is insufficient to prove a section 1981 claim. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Majeske v. Fraternal Order of Police, Local Lodge No.* 7, 94 F.3d 307, 312 (7th Cir. 1996) (citing *Melendez v. Illinois Bell*, 79 F.3d 661, 669 (7th Cir. 1996)). The essence of an equal protection violation, under the state or federal constitution, is unequal treatment, or some type of discrimination. *See Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005).

Here, Plaintiff has failed to set forth any evidence that HASB

intentionally discriminated against her based on race in its decision to terminate her lease. Although it is true that Plaintiff is African-American and that a termination notice was issued, her own testimony reveals that she believes HASB incorrectly held her accountable for the actions of other parties, not that HASB discriminated against her based on her race. (Pl. Dep., pp. 196-98.) Even assuming, *arguendo*, that Plaintiff's cursory allegations could be interpreted as evidence that African-Americans have statistically been subjected to more lease terminations, this would only amount to a disparate impact method of proof, which is insufficient to sustain a section 1981 equal protection claim. *See Majeske*, 94 F.3d at 312. Because Plaintiff has presented no evidence that race or unequal treatment was a factor in the HASB's decision to issue the first eviction notice, her Section 1981 and equal protection claims fail. *See Lunini*, 395 F.3d at 769 (emphasis in the original) ("[I]t is difficult to discern any equal protection violation in the circumstances of this case since [the plaintiff] has not demonstrated that he suffered unequal treatment - the essence of an equal protection violation is, after all, *discrimination* of some sort.").


Plaintiff's Third Party Beneficiary Claim Fails to Show a Contract Breach

Plaintiff has also set forth a third-party beneficiary claim based upon an alleged breach of the contract between Defendants and

30

the United States Department of Housing and Urban Development ("HUD"), of which Plaintiff claims to be a third-party beneficiary. Defendants' main qualm with this claim is that Plaintiff has failed to produce the contract to which she claims she is a third-party beneficiary.

Before addressing Defendants' argument, the Court pauses to address the somewhat dicey issue of whether federal or state law governs this issue and whether the Court has jurisdiction under section 1331 (an issue which neither party has provided any argument or authority to the Court). In the absence of further enlightenment from the Supreme Court, this Court is content to follow the Seventh Circuit's pronouncement in *Price v. Pierce*, 823 F.2d 1114, 1120-21 (7th Cir. 1987), finding that it is appropriate to treat third-party beneficiary status under federal law because it is important to have a uniform interpretation of housing cases where HUD approved of the contracts at issue. As such, the Court continues with its analysis, applying federal third-party beneficiary law.

Plaintiff has not produced the contract to which she claims she is a third-party beneficiary, vaguely referring to "her lease with HASB and documents from HASB, which are already in its possession." (Pl. Dep., p. 11; Dep. Ex. 1, Request for Production of Documents No. 15.) Additionally, when asked to identify the contract and exact provisions that have allegedly been breached, Plaintiff

stated in her interrogatory "[t]he funding grant or contract for
any year in which Plaintiff resided at HASB and the provisions
therein requiring HASB to comply with federal, state and municipal
law, including federal rules or regulations." (Pl. Dep., p. 11;
Dep. Ex. 1, Interrog. No. 13.) This case is similar to *Fincher v.
South Bend Heritage Found.*, No. 09-1964, 2010 WL 1838306, at *5
(7th Cir. May 10, 2010), in which the district court rejected a
third-party beneficiary claim of a contract entered into between
South Bend Heritage Foundation ("SBHF") and HUD because the
plaintiff did not produce the contract or identify any contract
terms or provisions he believed provided him with the basis for a
third-party beneficiary claim. The Seventh Circuit upheld this
decision, holding "[w]ithout pointing to some contractual provision
(or regulation) that grants him these rights and that SBHF has
violated, this claim cannot stand." *Id.* at *5. However, in
*Fincher*, the Plaintiff did not point to *any* specific regulations
that could stand in the place of a contract to support his claims.
*Id.* In this case, Plaintiff does at least point to the alleged
violation of the HUD rule at 24 C.F.R. 966.4(l)(5)(vii)(B) and (C)
which permit HASB to consider "all circumstances relevant to a
particular case" and to exclude only the "culpable household
member" as a way of mitigating consequences.

Even assuming, *arguendo,* that Plaintiff's citation to 24 C.F.R.
966.4 is sufficient to give rise to a claim under third-party

beneficiary law, this claim still fails on the merits. In public housing cases, federal third-party beneficiary law should be applied. The test for third-party beneficiary status is whether the contract reflects the intent of the parties to the contract to benefit the third party. *German Alliance Insurance Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912); *Holbrook v. Pitt*, 643 F.2d 1261, 1270 (7th Cir. 1981). With regard to HUD contracts, tenants under federal housing programs are considered third-party beneficiaries. *See Holbrook*, 643 F.2d at 1269-73. Additionally, HUD contracts appear to incorporate relevant HUD regulations. *See U.S. v. Moore*, 446 F.3d 671, 682 (7th Cir. 2006) (interpreting a contract inside the scope of HUD regulations); *Senate Manor Properties, LLC v. U.S. Dept. of Hous. and Urban Dev.*, No. 1:08-cv-0799-LJM-TAB, 2008 WL 5062784, at *4 (S.D. Ind. Nov. 24, 2008) (suggesting that contracts must be enforced in accordance with HUD regulations).

Although Plaintiff has sufficiently demonstrated that she is a third-party beneficiary of a HUD contract, she has failed to sufficiently show that HASB breached the terms of that contract. Plaintiff's response asserts that HASB violated 24 C.F.R. § 966.4, which permits a housing authority to consider mitigating circumstances and exclude only culpable household members. 24 C.F.R. 966.4(l)(5)(vii)(B) states that "the [Public Housing Authority] *may* consider all circumstances relevant to a particular

33

case . . . ." (emphasis added). However, Plaintiff fails to recognize that the regulation simply permits a housing authority to consider mitigating circumstances - it does not require the consideration of mitigating circumstances. In this case, HUD has granted HASB the sole discretion to consider all the circumstances. The fact that HASB decided to issue a termination notice is not a violation of the contract, but an exercise of HASB's contractual rights. The lease clearly specifies that criminal activity by any member of the household (or guest) is a breach of the lease and grounds for termination of the lease. As discussed later in this decision, it is undisputed that Henderson committed a criminal act (shooting a gun at Higgins) when he was considered to be under the control of Plaintiff, the tenant. There is no dispute of material fact whether HASB breached its contract with HUD; therefore, Plaintiff's third-party beneficiary claim must be dismissed.

Plaintiff's Fourteenth Amendment Claim Fails

Plaintiff further contends that Defendants violated her equal protection and due process rights guaranteed by the Fourteenth Amendment by threatening to evict her for the December 25th shooting. The Fourteenth Amendment to the United States Constitution guarantees that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. A legal rule depriving a person of property has

to be rational. *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 711 (7th Cir. 2004) (citing *Washington v. Glucksburg*, 521 U.S. 702, 728 (1997)). Due process requires a determination of good cause to justify terminating a public housing lease. *Lowery v. Housing Auth. of City of Terre Haute*, 826 N.E.2d 685, 689 (Ind. Ct. App. 2005).

In the public housing realm, federal regulations dictate that public housing tenants must "assure that no tenant, member of the tenant's household, or guest engages in: (A) Any criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other residents; or (B) Any drug-related criminal activity on or off the premises[.]" 24 C.F.R. § 966.4(f)(12)(i), (ii). Applicable regulations define a "covered person" as a "tenant, any member of the tenant's household, a guest or another person under the tenant's control." 24 C.F.R. § 5.100. The regulations also provide a clear definition of a person under the tenant's control and the premises on which that person is in the tenant's control:

> Other person under the tenant's control . . . means that the person, although not staying as a guest (as defined in this section) in the unit, is, or was at the time of the activity in question, on the premises (as premises is defined in this section) because of an invitation from the tenant or other member of the household who has express or implied authority to so consent on behalf of the tenant.
>
> Premises . . . means the building or complex or development in which the public or assisted housing

dwelling unit is located, including common areas
and grounds.

24 C.F.R. § 5.100.

In compliance with these regulations, Section 13 of the Lease
at issue in this case provides, in pertinent part, that:

> C. Criminal Activity Grounds for Termination by
> HASB. HASB has a One Strike or "Zero Tolerance"
> policy with respect to violations of Lease terms
> regarding criminal activity. Either of the
> following types of criminal activity by the
> Resident, **any member of the household, a guest, or
> another person under their control** shall be cause
> for termination of this Lease and eviction from the
> Dwelling Unit, even in the absence of an arrest or
> conviction:
>
> (i) **Any criminal activity that threatens the
> health, safety or right to peaceful enjoyment
> of HASB public housing premises by other
> Residents**; or
>
> (ii) Any drug-related criminal activity on or off
> such premises.
>
> ANY CRIMINAL ACTIVITY OR DRUG-RELATED CRIMINAL
> ACTIVITY SPECIFIED ABOVE CONSTITUTES A SERIOUS
> VIOLATION OF MATERIAL TERMS OF THE LEASE AND WILL
> BE GROUNDS FOR TERMINATION OF THE LEASE AND
> EVICTION FROM THE DWELLING UNIT. SUCH ACTIVITY
> CONSTITUTES GROUNDS FOR TERMINATION AND EVICTION
> NOTWITHSTANDING THE ABSENCE OF AN ARREST OR
> CONVICTION.

(Dwelling Lease, Para. 13(C) (emphasis added)).

The Supreme Court has addressed these regulations and a similar
statute to the one at issue in this case in *Department of Housing
& Urban Development v. Rucker*, 535 U.S. 125 (2002). There, the
Court upheld the eviction of four senior citizens living in public

housing after residents of their households or guests used drugs. The lease provision provided that "any member of the household, a guest, or another person under the tenant's control," shall not engage in any criminal activity or any drug-related criminal activity on or near the premises. *Id.* at 128. The Court found that the statute "unambiguously requires lease terms that vest local public housing authorities with the discretion to evict tenants for the drug-related activity of household members and guests whether or not the tenant knew, or should have known, about the activity." *Id.* at 130. The Supreme Court reasoned that "[r]egardless of knowledge, a tenant who cannot control drug crime, or other criminal activities by a household member which threaten health or safety of other residents, is a threat to other residents and the project." *Id.* at 134 (quotation omitted).

While the *Rucker* Court was concerned primarily with whether an individual could be evicted without actual knowledge of criminal activity, the Court did discuss the control requirement, the central issue in this case. The Court found that, by "control," the statute means that the tenant has permitted that person access to the premises. *Rucker*, 535 U.S. 125 at 126. The Supreme Court also determined that "under the tenant's control" modifies only the term "other person" and is not a modifier of the terms "member of the tenant's household" and "guest." *Id.* at 131. This suggests that a tenant can be evicted for the conduct of a household member

or guest regardless of whether the tenant could realistically control the conduct of that household member or guest. *Id.* The *Rucker* Court specifically addressed the due process argument, and rejected it. *Id.* at 135. Moreover, it found "[t]here are . . . no serious constitutional doubts about Congress' affording local public housing authorities the discretion to conduct no-fault evictions for drug-related crime." *Id.* (quotation omitted).[8]

Although the account of the December 25th shooting has changed from the version initially submitted to the HASB by the South Bend Police Department, it is apparent from the facts that at least one shooter was a person under the control of the tenant or other household members.[9] The facts reveal that Alfernando, a household member listed on the lease and therefore a "member of the household" (Dwelling Lease, pp. 1-2), had invited Henderson to the apartment premises for the purpose of bringing him home. Under the definition of control set forth in *Rucker* and in the relevant federal regulations, Henderson was permitted access to the premises

---

[8]Although *Rucker* analyzed the "drug related" criminal activity provision, the analysis is equally applicable to the criminal activity provision. *See Portage Metro. Hous. Auth. v. Brumley*, No. 2008-P-0019, 2008 WL 4693200, at *8 (Ohio Ct. App. Oct. 24, 2008).

[9]Plaintiff claims she did not know Higgins would be accompanying Harmon and the grandchildren to the apartment. (Pl. Dep., pp. 129, 131.) However, Harmon said she told Plaintiff that Higgins would be driving them to the apartment. (Harmon Dep., p. 147.) Thus, there is a material disputed fact as to whether Higgins was a person under the tenant's control. This is not dispositive of the issue, though, because the regulations apply to any "covered person" as a "tenant, any member of the tenant's household, a guest or another person under the tenant's control." 24 C.F.R. § 5.100. Thus the Court needs to find that only one covered person engaged in criminal activity that threatened the safety of others in HASB. In this case, it is undisputed that Henderson was a person under the tenant's control, because he was invited onto the premises by Alfernando, a member of the household.

38

by someone with implied authority (Alfernando). *See* 24 C.F.R. §
5.100. Alfernando was a household member, and he had the authority
to invite Henderson to the premises. As such, Plaintiff's claim
for violation of due process fails because the HASB was justified
in issuing the termination notice.

Additionally, Plaintiff argues that the Defendants violated her
right to equal protection of the laws by discriminating against
her. In order to sustain an equal protection claim, a plaintiff
must present evidence that she was treated differently based on her
membership in a particular group. *See New Burnham Prairie Homes,
Inc. v. Village of Burnham*, 910 F.2d 1474, 1481 (7th Cir. 1990).

Here, Plaintiff has failed to show that she was treated any
differently because she was African-American. Plaintiff has
presented no evidence from which a jury could infer that
Defendant's actions were improperly motivated, thus, summary
judgment is appropriate. *See Hilton v. City of Wheeling*, 209 F.3d
1005, 1008 (7th Cir. 1997) (affirming summary judgment where no
evidence of illegitimate animus was present).

In her response, Plaintiff introduces several new arguments in
an attempt to redefine her Fourteenth Amendment claim; however,
these arguments also fail. A claim raised for the first time in
response to a motion for summary judgment is not properly before
the Court. *Conner v. Illinois Dep't of Natural Resources*, 413 F.3d
675, 679 (7th Cir. 2005); *see also Chinn v. Cantrell*, No. 2:04 cv

39

393, 2006 WL 2927595, at *4 (N.D. Ind. Oct. 11, 2006). In addition to this procedural bar, these new claims also fail on the merits.

First, Plaintiff contends that HUD rules do not permit the eviction. Plaintiff's argument rests on several cases, regulations, and other sources that permit a housing authority to consider mitigating circumstances when determining whether to evict a tenant. On the contrary, the law clearly establishes that the decision to actually consider those factors lies in the sole discretion of the housing authority. *See* 24 C.F.R. § 966.4(1)(5)(vii)(B). The United States Housing Act requires that public housing agencies use leases that allow for the termination of a lease for "any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants . . .." 42 U.S.C. § 1437d(1)(6). This approach was reinforced in *Rucker* when the Supreme Court recognized that strict liability and no-fault evictions were reasonable means to provide decent, safe, and drug-free public housing. *Rucker*, 535 U.S. at 134.

Moreover, the Plaintiff's reliance on *Lowery* is inapposite. In *Lowery*, the court opined that it may be overly burdensome to require a handicapped individual to exert physical control over a young and able-bodied individual. *Lowery*, 826 N.E.2d at 689-90. The *Lowery* court went on to find that regardless of whether the plaintiff's stepson engaged in criminal activity, or whether the

plaintiff was able to prevent the alleged criminal activity, the record revealed an alternative basis to evict the plaintiff. *Id.* at 690. Nothing in the statutes, regulations, or Supreme Court precedent suggest that the "control" test is measured by a tenant's ability to actually overpower the individual engaged in criminal conduct. On the contrary, the Supreme Court stated that "control" means that the tenant has permitted a person access to the premises. *Rucker*, 535 U.S. at 126. Furthermore, federal regulations state that a person is under a tenant's control when that person "is on the premises . . . because of an invitation from the tenant or other member of the household . . .." 24 C.F.R. § 5.100. To suggest that a tenant must be able to physically overpower an individual before "control" can be established would remove all power from the regulation and lead to highly inconsistent and absurd results.

Plaintiff's reliance on other sources is also misplaced. All of the regulations cited by Plaintiff demonstrate that a housing authority *may* consider mitigating circumstances, never that they *must* consider other circumstances. *See* 24 C.F.R. § 960.204(a)(1) (stating that the PHA *may* admit the household under certain circumstances); 24 C.F.R. § 966.4(l)(5)(vii)(B) (recognizing that the PHA *may* consider all circumstances of a particular case or *may* decide to act in a way that excludes only the culpable household member); *Bennington Hous. Auth. v. Bush*, 933 A.2d 207, 213 n. 1

(Vt. 2007) (recognizing that a housing authority *may* consider all circumstances relevant to a particular case).  Plaintiff does not point to any regulation or binding court decision to support her argument that her eviction violated HUD rules.  Plaintiff has merely pointed to regulations that permit a housing authority to consider mitigating circumstances if it so chooses.  Here, the HASB allegedly decided not to consider mitigating circumstances, a decision that clearly lies in its discretion.

Also, in her response, Plaintiff attempts to argue that the lease between the HASB and herself was an "illegal contract" and is therefore unenforceable.  This argument was first introduced in response to Defendants' summary judgment motion and is also waived. *See Conner v. Illinois Dep't of Natural Resources*, 413 F.3d at 679.  In sum, Plaintiff has failed to sufficiently support her Fourteenth Amendment claim; therefore, summary judgment is granted.

<u>Plaintiff's Remaining State Law Claims Are Dismissed Without Prejudice</u>

Plaintiff also asserts under Indiana state law that Defendants breached the lease contract entered into by Plaintiff and HASB by failing to comply with its terms.  Plaintiff further claims that she and her sons were denied due course of law and equal access to the courts as guaranteed by Indiana's state constitution.  Upon due consideration, these state law claims are **DISMISSED WITHOUT**

**PREJUDICE** because the federal claims have been dismissed prior to trial. 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

CONCLUSION

For the reasons set forth below, the State of Indiana's Motion for Summary Judgment (DE #57) is **GRANTED** on the grounds that the Court finds Plaintiff's challenge to the Indiana Code section 32-30-3-1 *et seq.* is **MOOT**. Defendants' Motion for Summary Judgment (DE #60) is also **GRANTED**. The Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Plaintiff's federal claims (Cause of Action Nos. 1-4). The Clerk is **ORDERED** to **DISMISS WITHOUT PREJUDICE** Plaintiff's state law claims for breach of contract (Cause of Action No. 5) and violation of Indiana's state constitution (Cause of Action No. 6). Furthermore, the Clerk is **ORDERED** to **CLOSE** this case.

**DATED: June 23, 2010**                    **/s/ RUDY LOZANO, Judge**
                                            **United States District Court**